DAMROW v THUMB COOPERATIVE TERMINAL, INC

Docket No. 65662. Submitted April 13, 1983, at Lansing.—Decided June 7, 1983. Leave to appeal denied, 418 Mich __.

Plaintiff, Joyce Damrow, was employed by defendant Thumb Cooperative Terminal, Inc. Subsequent to plaintiff's hiring, the defendant adopted an employee manual as the operating policy of the company. Among the provisions of the manual were the procedures to be followed in the discharge of an employee. Plaintiff was subsequently discharged. She brought an action against defendant for wrongful discharge, alleging·a breach of the employment contract as set forth in the employee manual. The Huron Circuit Court, M. Richard Knoblock, J., found in favor of defendant and entered a judgment of no cause of action. Plaintiff appeals. *Held:*

The defendant was obligated to comply with the rules and procedures set forth as company policy in the employee manual in discharging an employee. Those procedures were not followed in this case, nor was there any showing that plaintiff was discharged for "gross misconduct" which, pursuant to the manual, is punishable by summary discharge.

Judgment vacated, and remanded.

1. Labor Relations — Employment Contract — Discharge of Employee.

A provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable although the contract is not for a definite term; such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employ-

References for Points in Headnotes

[1] 53 Am Jur 2d, Master and Servant § 45.
[2] 53 Am Jur 2d, Master and Servant § 14 *et seq.*
[3] 53 Am Jur 2d, Master and Servant § 43.
   Modern status of rule that employer may discharge at-will employee for any reason. 12 ALR4th 544.
   Employee's arbitrary dismissal as breach of employment contract terminable at will. 62 ALR3d 271.

ee's legitimate expectations grounded in an employer's policy statements.

2. LABOR RELATIONS — EMPLOYMENT CONTRACT — EMPLOYER POLICES.

An employee who claims contractual ·rights arising from his employer's policy statements is not required to prove that he relied on those policies.

3. LABOR RELATIONS — EMPLOYER POLICIES.

An employer is not free to depart from existing employee policies simply because it was under no obligation to adopt them in the first place; therefore, an employer which adopted procedures regarding the discharge of employees, set forth in an employee manual, was obligated to comply with those procedures in discharging an employee without regard to the fact that the employee had been hired prior to the adoption of the manual.

*Keller, Katkowsky & Golden, P.C.* (by *Lawrence S. Katkowsky*), for plaintiff.

*Smith & Brooker, P.C.* (by *Mona C. Doyle* and *Glenn F. Doyle*), for defendant.

Before: DANHOF, C.J., and ALLEN and D. F. WALSH, JJ.

D. F. WALSH, J. Plaintiff, Joyce Damrow, sued defendant, Thumb Cooperative Terminal, Inc., for wrongful discharge from employment, alleging breach of the employment agreement between the parties as set forth in defendant's employee manual. The circuit court, sitting as trier of fact, found in favor of defendant. Plaintiff appeals entry of a judgment of no cause of action. We address only the dispositive issue of whether plaintiff proved a breach of an employment agreement; we must decide the applicability, if any, of the Supreme Court's decision in *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980), *reh den* 409 Mich 1101 (1980).

Plaintiff was hired by defendant as a bookkeeper

in September, 1976. The hiring authority at that time was vested in general manager Wayne Bauer. On March 28, 1977, Bauer appointed plaintiff to the position of office manager. At trial Bauer testified that it was his understanding that plaintiff would continue as office manager as long as she wanted, providing she performed properly; "[o]therwise it was kind of an indefinite" arrangement. Bauer and plaintiff enjoyed a good working relationship.

After plaintiff was hired, Bauer was authorized by the board of directors to prepare an employee manual. On May 16, 1977, the board adopted the manual as the "operating policy" of the company and declared that it would "remain in full force and effect until * * * revised, superseded or cancelled by the issuing authority".

Copies of the manual were distributed to all employees. There was a general meeting so that the manual could be explained and employees' questions could be answered. On May 19, 1977, plaintiff signed a form, witnessed by Bauer, in which she stated:

"As the undersigned, I hereby acknowledge, on this date, I have received, reviewed and understand the personnel policies, benefits and guidelines as set forth in the Thumb Cooperative Terminal, Incorporated, Employee Manual as effected on the 16th day of May, 1977, including all subsequent additions, deletions and amendments."

According to Bauer, the purpose of the manual was to provide continuity, improve communication between defendant and its employees, to set out their respective obligations, and to identify the disciplinary actions which would be taken if an employee's conduct proved unsatisfactory. He testi-

fied that the manual applied to employees hired before and after its adoption; the manual changed the arbitrary manner in which disciplinary matters had previously been handled. According to the president of defendant's board of directors, the purpose of the manual was to acquaint employees with the rules of the company. He acknowledged that the manual was in full force and effect at the time of plaintiff's discharge.

Bauer left defendant's employ in late 1978. James Bollenbacher was hired to replace him as general manager; he began working on February 1, 1979. The working relationship between Bollenbacher and plaintiff was never a good one. They had many heated arguments; the atmosphere permeating their interactions was always tense.

On January 24, 1980, Bolenbacher fired plaintiff, giving her no reasons for his action. According to plaintiff, he had previously given her two verbal warnings concerning her performance. She had received no prior written warnings, and her discharge was preceded by no less drastic disciplinary action. In documents prepared after the discharge, Bollenbacher stated that the reasons for his action were plaintiff's resistance to changes recommended by him, her inability to adjust to him and his policies, and her inability or refusal to delegate responsibility. It was repeatedly emphasized, however, that plaintiff's work skills were in no way deficient. In deposition testimony, Bollenbacher stated that plaintiff had failed to change her accounting system after he had asked her to do so. In addition, he identified the following problems which, in combination, had led him to the decision to fire plaintiff: (1) plaintiff's working an average of 47 hours per week after being changed from salaried to hourly status and being asked by Bol-

lenbacher to work only 40-hour weeks; (3) plain-
tiff's sending her own audit to the bank without
Bollenbacher's knowledge and before the certified
public accountants had finished their six-month
audit; (3) the considerable discrepancy between the
audits.

Plaintiff disputed the stated reasons for her
discharge. She testified that Bollenbacher never
gave her any direction, that he had never asked
her to work a 40-hour week and that it had always
been her responsibility to send audits to the bank.
She stated that Bollenbacher had asked her to
delegate more responsibility, but that she had not
refused to do so. She described Bollenbacher's fiery
temper and the resultant tension in the office.

Plaintiff also testified that it had been her un-
derstanding that she would continue as office man-
ager until she quit or until she was not able to do
the job properly. She described the meeting at
which the employee manual had been presented,
and testified that the employees were told that the
manual contained the "rules and regulations" that
would thenceforth be followed.

Presented in the employee manual are a de-
tailed description of the company—its history and
organization—and extended discussion of employee
classifications, schedules, promotions, salaries,
wages, performance reviews, benefits and termina-
tions. With particular reference to employee per-
formance and discharge, the manual sets out a
comprehensive scheme of work rules. The follow-
ing policy statement precedes these work rules:

"*If You Are Discharged*

"We don't expect it to happen very often, but on
occasion we will have reason to discharge an employee.
The fact is, some people do not do their fair share of

work, or do not adhere to guidelines, or just cannot get along with other employees. When one or all of these situations take place, we are forced to discharge the person(s) involved. Naturally, discharged employees forfeit all employee benefits.

"No employee will be discharged without prior *final warning*, except for cases involving dishonesty, gross insubordination and other such serious offences as defined in the Terminal work rules section of this manual. Any final warning will not remain in effect for more than twelve (12) months." (Emphasis in original.)

The work rules address problems of theft, physical violence, drinking and drugs (all subject to immediate discharge without final warning); possession of illegal weapons, failure to comply with garnishment requirements and failure to follow safety procedures (a written, final warning at first offense and immediate discharge at second offense); solicitation (written warning at first offense, 3-day payless suspension with final warning at second offense and immediate discharge at third offense); and gambling, obscenity, unauthorized use of telephones, tardiness and absenteeism (written warnings at first and second offenses, 3-day payless suspension with final warning at third offense, and immediate discharge at fourth offense). Gross misconduct, which is subject to immediate discharge, with no final warning, is defined as:

"The refusal to do assigned work (includes walking off the job); deliberate insubordination; horseplay or the deliberate violation of safety practices and procedures resulting in injuries or excessive damage; or wilful damage to equipment and property of the Terminal."

The rule concerning disciplinary action to be taken in the event of unsatisfactory employee performance provides:

*"Performance*

"The failure to be in your assigned work area at the scheduled time; leaving your assigned work area without the approval of your immediate supervisor (except in the case of emergency, accident or injury); loafing or stalling during working hours; failure to report to your immediate supervisor that you have completed your assigned task(s); failure to properly follow orders or instructions of your supervisor; and a demonstrated and repeated failure or inability to meet minimum standards of responsibility, skill, or other requirements inherent in the work assigned, including the failure to meet minimum production and/or quality standards.

"First offense_____Written warning
"Second offense_____Written warning
"Third offense_____3 day suspension without pay, including final warning
"Fourth offense_____Subject to immediate discharge"

The trial court found that the difficulties which led to plaintiff's discharge were merely a manifestation of the personality conflict between plaintiff and Bollenbacher. The court found: (1) that plaintiff's employment contract was of indefinite duration and terminable at the will of either party, citing *Lynas v Maxwell Farms,* 279 Mich 684; 273 NW 315 (1937); (2) that the Supreme Court's "pronouncements [in *Toussaint v Blue Cross, supra]* concerning contractual rights arising from the policy statements contained in the employee manual can be considered dictum"; and (3) that even assuming that defendant was obligated to comply with the employee manual, there was sufficient compliance in that (a) defendant had ample cause to discharge plaintiff, and (b) plaintiff was warned on at least two occasions that she might be discharged. The court found that these warnings constituted compliance with the "spirit" of the

manual and that any breach on defendant's part was not "material". The court concluded:

"To require the employer to respond in damages for failing to comply with the precise letter of an employee manual adopted some time after the beginning of the employment relationship where there has been compliance with its spirit, would simply be unjust."

On the authority of *Toussaint v Blue Cross, supra,* we reverse.

In *Toussaint,* the Supreme Court held, *inter alia,* that

"(1) a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable although the contract is not for a definite term—the term is 'indefinite', and

"(2) such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements." 408 Mich 598.

In elaboration, the Court stated:

"While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No preemployment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes

that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation 'instinct with an obligation'.

\* \* \*

"We hold that employer statements of policy, such as the Blue Cross Supervisory Manual and Guidelines, can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and, hence, although the statement of policy is signed by neither party, can be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in preemployment interviews and the employee does not learn of its existence until after his hiring." 408 Mich 613-615. (Footnotes omitted.)

Employees who claim contractual rights arising from employers' policy statements need not prove that they relied on those policies. 408 Mich 613, fn 25.

In response to the claim that large employers would be severely hampered if policy manuals were held to form part of employment contracts, the court noted that employers are not obligated to establish personnel policies. Employers can also make known to their employees that personnel policies are subject to unilateral change by the employer, thereby avoiding any reasonable expectation in the employees that a particular policy would continue to remain in effect. Employers, however, are not free to depart from existing policies simply because they were under no obligation to adopt them in the first place:

"Having announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory." 408 Mich 619.

The Supreme Court reinstated a jury verdict in favor of Mr. Toussaint, finding, *inter alia,* that he had presented a jury submissible issue of legitimate expectation that he would be discharged only for cause and in compliance with procedures set forth in his employer's manual of personnel policies. 408 Mich 614.

We are not persuaded that the Supreme Court's discussion of contractual rights arising from employment policy manuals was merely dicta. In direct response to the *Toussaint* facts, the Supreme Court clearly held that such statements of employer policy can give rise to contractual rights in employees.

The Supreme Court noted that the *Toussaint* plaintiff's employer had offered no evidence that its manual did not represent company policy on the subjects of discipline and termination. 408 Mich 614. Similarly, in the instant case the evidence established conclusively that the manual set out the company's obligations vis-à-vis its employees and that it was defendant's intention to follow the manual procedures. The board of directors expressly adopted the manual as the operating policy of the company and declared that the manual would remain in effect until revised, superseded or cancelled. Employees were given copies of the manual and were required to acknowledge, in writing, that they understood its provisions.

The trial court attached some significance to the fact that plaintiff was hired before adoption of the employee manual. In our judgment, *Toussaint* is

not distinguishable on this ground. The Supreme Court's holding does not hinge on the date of the adoption of the policy. On the contrary, the Court's discussion clearly suggests general applicability of such policy statements to all employees regardless of date of hiring. 408 Mich 613. In addition, the Court cited with approval its decision in *Cain v Allen Electric & Equipment Co,* 346 Mich 568; 78 NW2d 296 (1956). *Toussaint, supra,* pp 615-616. In *Cain,* the fact that a severance pay policy had been announced long after the plaintiff became an employee did not defeat the plaintiff's right to such pay.[1]

We hold that defendant was obligated to comply with the rules set forth in the employee manual in discharging its employees, including plaintiff.

We are not persuaded by defendant's suggestion that plaintiff was discharged for "gross misconduct". The trial court did not find that she was discharged for "gross misconduct" and we concur in the court's implicit finding that she was not discharged for that reason. Accordingly, defendant was not entitled to rely on the immediate discharge/no final warning provision governing instances of gross employee misconduct.

It is clear, as the trial court implicitly recognized, that plaintiff was discharged for unsatisfactory performance. The manual provides, however, that an employee whose performance does not prove satisfactory to his or her supervisor is entitled, prior to discharge, to two separate written warnings followed by a final warning accompanying a three-day suspension without pay. Only upon the fourth incidence of unsatisfactory performance, and after those prior warnings, is an em-

---

[1] See, also, Eisler, *Annual Survey of Michigan Law, Contracts,* 28 Wayne L Rev 719, 741-742 (1982).

ployee subject to immediate discharge. Through adoption of the manual, defendant freely obligated itself to follow these procedures. Compare *Chamberlain v Bissell, Inc,* 547 F Supp 1067, 1074, 1078-1080 (WD Mich, 1982).

It is not disputed that the manual procedures governing discharge for unsatisfactory performance were not followed in plaintiff's case. She received two verbal warnings prior to her immediate discharge. She was given no written warnings, no suspension and no final warning. Even assuming, as ruled by the trial court, that compliance with the "spirit" of the manual would be sufficient, we do not hesitate to find that defendant's noncompliance in this case was substantial and material.

We vacate the judgment of no cause of action and remand to the trial court for proceedings consistent with this opinion.